**WO**                                                                     MGD

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronnie Hassan Harb, | No.  CV 21-01032-PHX-MTL (ESW) |
| Plaintiff, | |
| v. | **ORDER** |
| Paul Penzone, | |
| Defendants. | |

Plaintiff Ronnie Hassan Harb, who is currently confined in the Red Rock Correctional Center in Eloy, Arizona, brought this civil rights action pursuant to 42 U.S.C. § 1983 regarding the alleged lack of COVID-19 precautions at the Maricopa County Towers Jail.  (Doc. 1.)  Before the Court are the parties' cross Motions for Summary Judgment.[1]  (Docs. 53, 68.)

**I.    Background**

On screening Plaintiff's Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Fourteenth Amendment conditions-of-confinement claims in Counts One and Two against Defendant Maricopa County Sheriff Paul Penzone, in his official capacity, and directed Penzone to answer the Complaint.  (Doc. 5.)

. . . .

. . . .

---

[1] Plaintiff was informed of his rights and obligations to respond to Defendant's Motion pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 55).

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

. . . .

. . . .

. . . .

### III.   Relevant Facts[2]

During the relevant time, Plaintiff was a pre-trial detainee in the custody of the Maricopa County Sheriff's Office (MCSO).  (Doc. 54 ¶ 1.)  Plaintiff was admitted to MCSO custody on February 25, 2020 and was housed at Towers Jail from February 27 until June 20, 2020.  (*Id.*)

In Towers Jail, Plaintiff was primarily housed in a cell with two other inmates. (Doc. 69 ¶ 2.)  The cells are approximately 6 feet wide, 11 feet long, and 9 feet high, with a toilet-sink combination, a wall-mounted table and seat, and one triple bunk bed with the top bunk about 6.5 feet off the ground.  (*Id.* ¶¶ 3, 4.)  To move up and down off the bunk bed or use the toilet or table, the occupants are forced to come within close proximity to one or both cellmates.  (*Id.* ¶ 5.)  Defendant disputes and denies each of Plaintiff's facts about the cell, asserting they are either unsupported by the record, could not be presented in a form that would be admissible in evidence, or are irrelevant.  (Doc. 74 ¶¶ 2-5.)  To the extent Defendant is objecting to Plaintiff's evidence, the objections are overruled because each of Plaintiff's facts is supported by Plaintiff's own experience and perceptions and could be presented in a form admissible in evidence.

---

[2] The relevant facts are taken primarily from Defendant's Statement of Facts (Doc. 54), Plaintiff's Statement of Facts in Opposition (Doc. 62), Plaintiff's Statement of Facts in Support of his Motion for Summary Judgment (Doc. 69), and Defendant's Controverting Statement of Facts (Doc. 74).

Plaintiff did not respond to all of Defendant's 99 separate Statements of Fact, and Defendant asks the Court to consider each of his approximately 47 facts that Plaintiff does not address as uncontroverted.  (Doc. 65 at 2-3.)  The Court will only consider Defendant's supported facts undisputed if they are not clearly controverted by Plaintiff's first-hand allegations in the verified Complaint or other evidence in the record.  *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).  Defendant also objects to Plaintiff's Separate Statement of Facts in support of Plaintiff's Motion for Summary Judgment on the basis that Plaintiff's facts and supporting affidavit "are comprised of Plaintiff's self-serving testimony, in addition to conclusory and speculative allegations, which are inadmissible in evidence." (Doc. 74 at 1-2.)  Defendant's blanket objection is overruled because it lacks specificity and because a "self-serving [affidavit] bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact."  *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999); *see Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (the district court cannot "disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature[,]" even if it is uncorroborated). Plaintiff can certainly attest to those facts for which he has personal knowledge.  *See* Fed. R. Civ. P. 56(c)(4) (declaration used to support summary judgment motion must be made on personal knowledge).

**A.    COVID-19**

COVID-19 is a respiratory virus that is thought to spread mainly through respiratory droplets produced when an infected person coughs, sneezes or talks.  (Doc. 69 ¶ 17.)  On March 23, 2020, the Centers for Disease Control and Prevention (CDC) released its "Interim Guidance on Management of Corona Virus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (hereafter, the "CDC Guidance").[3]   (*Id*. ¶ 2.) Defendant has stated that "MCSO operations are guided by and in adherence with" the CDC's Guidance.  (*Id*. ¶ 11.)  The CDC's Guidance on COVID-19 states that persons at higher risk "may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease and diabetes, including chronic kidney disease" and facilities "should make all possible accommodations to reduce exposure risk for the increased risk individual."  (*Id*. ¶ 13.)  Plaintiff is included in the higher risk category because of underlying health conditions including asthma and bronchitis, chronic hepatitis C, and polycystic kidney disease. (*Id*. ¶ 15.)  Plaintiff has also been diagnosed with antisocial personality disorder, bipolar depression, and anxiety.  (*Id.* ¶ 16.)  Defendant disputes these facts as irrelevant, unsupported by the record, and because Plaintiff did not allege he was a person at higher risk who needed accommodations.  (Doc. 74 ¶¶ 13, 15, 16.)   The Court finds Plaintiff's medical conditions are relevant to the disposition of the summary judgment motions and that Plaintiff is competent to attest as to his own medical conditions.

Maricopa County Correctional Health Services (CHS) has issued precautions "to reduce the risk of airborne transmission of infectious agents by dissemination of airborne drop nuclei (.5 microns or smaller in size) of evaporated droplets that may remain suspended in the air for long periods of time, or of dust particles containing the infectious agent."  (Doc. 69 ¶ 18.)  The CDC Guidance states that good hygiene practices, vigilant symptoms screening, wearing cloth face coverings, and social distancing are critical in

---

[3] Defendant refers to the CDC Guidance on COVID-19 as "CDC guidelines."  To avoid confusion, the Court uses "CDC Guidance" in lieu of "CDC guidelines."

preventing further transmission, with social distancing "a cornerstone of reducing transmission of respiratory diseases such as COVID-19." (*Id.* ¶¶ 21, 22.) According to the CDC Guidance, social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals)." (*Id.* ¶ 25.) Defendant does not dispute that "the CDC guidelines is a guidance" but disputes and denies Plaintiff's fact as a mischaracterization of the evidence and as unsupported by the record. (Doc. 74 ¶ 21.) Defendant asserts that the CDC Guidance recognizes that social distancing "is challenging to practice in a correctional setting," that "[s]trategies will need to be tailored to the individual space in the facility," and "[n]ot all strategies will be feasible in all facilities." (Doc. 74 ¶ 20.) Defendant further notes that the CDC Guidance states that "[s]ocial distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them)," that inmates/detainees wear cloth face coverings "if able" and that MCSO adhered to the CDC Guidance's recommendations concerning good hygiene practices, symptom screening, and social distancing. (*Id.*)

MCSO posted signs in the jail common areas to maintain a distance of six feet from others. (Doc. 69 ¶ 28.)

### B. Plaintiff

#### 1. Plaintiff's Grievance

In an Inmate Grievance dated June 1, 2020, Plaintiff wrote:

> I do not feel like the MCSO jails have taken enough steps to prevent the spread of COVID 19. I do not have the suggested means of protecting myself against the virus available to me. Such things as hand sanitizer, disposable gloves, anti-viral hand and body soap, anti-viral cleaner for my living area, access to face masks on a regular basis and space for social distancing. I would like to be released from custody until these needs cans be met.

(Doc. 61-1 at 46.)  A Shift Sergeant responded on June 3, 2020: "MCSO is taking all necessary steps to stop the spread of COVID-19 this includes to isolate all others from others [sic].  MCSO already provides all necessities for a housing unit to remain clean." (*Id*.)  An addendum to the response states, in part "if you have any personal medical concerns, please address them with [CHS].  Cleaning supplies including disinfectants are provided to your housing unit 3 times a day and will be refilled at your request.  Also, the CDC released guidelines for Correctional and Detention facilities that differ from the guidelines for the general public.  The [MCSO] abides by those guidelines within its facilities." (*Id*. at 48.)

Plaintiff filed an Inmate Grievance Appeal on June 9, 2020 stating he does not believe "MCSO jail staff is taking adequate precautions to stop the spread of COVID-19 and in turn is holding me in an unsafe environment that is potentially increasing my risk of exposure and increasing on day-to-day basis."  (*Id*. at 49.)  A commander responded on June 10, 2020:

> The inmate's request to be released from MCSO Jail Custody is a matter to be addressed by the inmate and his defense attorney with the judge presiding over the inmate's legal cases. Tower Jail custody staff are repeatedly briefed to issue, refill as needed, and provide cleaning equipment and cleaning supplies to the inmate population.  MCSO vehicles used to transport inmates are disinfected after each separate transport trip, before the vehicles are used for the next transport trip, as verified with Sgt, MCSO transportation division.  Support services such as food and laundry services, abide by guidelines set forth by the Maricopa County Health Department, the Correctional Health Services . . . .

(*Id*. at 50.)

Plaintiff appealed to an External Referee who found that Plaintiff's allegation was unfounded and not supported by facts.  (*Id*. at 51.)  The External Referee wrote that they "have reviewed the CDC guidelines for detention facilities and it appears the staff are following these guidelines based on the phases."  (*Id*.)

**2.      Plaintiff and COVID-19**

On June 15, 2020, Plaintiff was tested for COVID-19 as part of mass testing of all inmates at Towers Jail and he received a positive test result on June 19, 2020.  (Doc. 54 ¶ 2.)  Upon testing positive, Plaintiff was transferred to Lower Buckeye Jail for medical observation until he was cleared to return to general population on June 29, 2020.  (*Id.*)  Plaintiff reported head and muscle aches and congestion on June 22, 2020, for which he was prescribed pain and allergy medications.  (*Id.* ¶ 5.)  Plaintiff received temperature and symptoms checks while he was in medical observation, and his temperature ranged from 97.2 to 99.9 degrees Fahrenheit with a low-grade fever for one day of 101.8 degrees on June 21, 2020.  (*Id.* ¶ 4.)  By June 25, 2020, Plaintiff's symptoms had all resolved, and he denied feeling ill or experiencing fever, cough, shortness of breath, sore throat, rhinorrhea, headaches, or muscle aches.  (*Id.* ¶ 6.)  On June 29, 2020, he again denied feeling ill or experiencing fever, cough, shortness of breath, sore throat, rhinorrhea, headaches, or muscle aches; because he had been fever and symptom free for at least 72 hours, Plaintiff was discharged from Medical Observation that day, in accordance with CDC guidelines. (*Id.* ¶¶ 6, 7.)

In the month that followed, Plaintiff did not report any of the medical or psychological symptoms he now alleges in his Complaint, and he did not submit any Health Needs Requests seeking treatment for any of these conditions.[4]  (*Id.* ¶ 8.)

Plaintiff was released from MCSO custody in July 2020 and was rebooked into MCSO custody in August 2020 and again in November 2020; neither time did he report that he was experiencing any of the medical or psychological conditions claimed in his Complaint and he did not request medical or mental health services.  (Doc. 54 ¶ 9.)

---

[4] Plaintiff alleges in his Complaint that he was injured by the "introduction of the COVID-19 virus into the jail and thus into my body; muscle pain, headaches, fatigue, loss of appetite. Psychological trauma from the virus may lead to h[e]ightened anxiety and PTSD." (Doc. 1 at 3.) In his request for relief, Plaintiff is seeking $250,000 "to compensate for attorney fees and the potential medical issues that may come from this virus in the coming years of my life.  Also to help me pay for psychological healthcare from the trauma I have gone through including being exiled from my home and family upon release after testing positive while the virus repercussions were unknown." (Doc. 1 at 10.)

1      During an incarceration that began in April 2021, Plaintiff received the single dose

2  Johnson and Johnson vaccine on June 10, 2021.  (Doc. 54 ¶ 10.)

3          **C.      MCSO**

4              **1.      MCSO Response to COVID-19 at Towers Jail**

5      Until June 2020, Towers Jail housed three inmates per cell, but this housing protocol

6  was changed on June 29, 2020, in response to COVID-19.  (Doc. 54 ¶ 18.)  MCSO closed

7  the Durango Jail in May 2020 and Plaintiff asserts this facility could have been used to

8  alleviate the three-man cells at Towers Jail earlier than June 29, 2020.  (Doc. 62 ¶ 7.)

9  Defendant admits that MCSO closed Durango Jail but disputes Plaintiff's statement that

10  Durango Jail could have been used to alleviate the three-man cells at Towers Jail, asserting

11  that Plaintiff's fact is unsupported by the record and irrelevant.  (Doc. 74 ¶ 32.)  Because

12  Towers Jail had a low population, Defendant contends Plaintiff had the opportunity to

13  practice social distancing and other precautions to protect against COVID-19.  (*Id*.)  For

14  example, inmates in adjacent beds could increase the distance between themselves by

15  sleeping head to toe, and the solid metal beds "provided an adequate barrier between

16  residents while sleeping."  (Doc. 54 ¶ 19.)  Plaintiff contends these were not adequate

17  barriers because COVID-19 is a respiratory virus spread mainly through respiratory

18  droplets produced when an infected person coughs, sneezes, or talks, and the inmates were

19  in a small space where the air was being circulated by an A/C fan, gravity, and natural

20  breath.  (Doc. 62 ¶ 8.)

21      The population at the Towers Jail, as with other MCSO facilities, was significantly

22  reduced to promote social distancing and to protect the inmate population and MCSO staff

23  amid COVID-19.  (Doc. 54 ¶ 20.)  The population at Towers Jail on May 15, 2020 was

24  60% (656 inmates) of design capacity, on June 1, 2020, it was 65% (703 inmates) of design

25  capacity, and on June 30, 2020 it was 54.7% (591 inmates) of design capacity.  (Doc. 54

26  ¶ 21.)  Plaintiff contends that Defendant's paragraphs 20 and 21 are "invalid" because

27

28

Defendant provides conflicting total capacity numbers for Towers Jail with one official saying total capacity is 980 and another stating it is 1080.[5]  (Doc. 62 ¶ 10.)

Contrary to Plaintiff's allegations, it was not necessary to move inmates, given the low population at Towers Jail, and because Plaintiff had the opportunity to practice social distancing and other precautions to protect against COVID-19 at Towers Jail.  (Doc. 54 ¶ 22.)  Plaintiff could not prevent being housed in a three-man cell until he was moved to medical isolation on June 20, 2020.  (Doc. 62 ¶ 10.)  The CDC issued its Guidance on March 23, 2020, and Plaintiff could have been housed at Durango Jail before its closing in May 2020.  (*Id.* ¶ 11.)

### 2.    MCSO's Overall Response to COVID-19

MCSO's COVID-19 policies have continued to evolve during the pandemic.  (Doc. 54 ¶ 23.)   MCSO began consulting with CHS in late February 2020 regarding the possibility that steps would need to be taken to deal with the pandemic.  (*Id.* ¶ 25.)  CHS advised MCSO regarding any changes in the CDC Guidance, developed Standard Operating Procedures (SOP) on March 23, 2020 to address slowing the spread of COVID-19 within the Maricopa County Jail system, and the SOP was updated on July 10, 2020 and continues to be updated as information from the CDC and medical professionals becomes available.  (*Id.* ¶ 31.)

On March 15, 2020, MCSO suspended access into jail facilities for all inmate volunteer and supplemental services and in-person visitation except for attorney visits, which could still take place in non-contact, glass-partitioned rooms or through video visits.  (*Id.* ¶ 26.)  MCSO's newly established tablet technology allowed inmates at all MCSO jails to communicate with family, friends, and community members through video visitation, messaging, and electronic photos.  (*Id.*)  All non-employee access into jail facilities was limited to legal or essential personnel only.  (*Id.*)  MCSO followed court directives about

---

[5] Plaintiff states that during discovery he requested count sheets, rosters, and confirmed virus counts, but Defendant did not deliver those documents to Plaintiff.  (Doc. 69 ¶ 33.)   Defendant responds that Plaintiff failed to raise the issue of any withheld documents through the meet-and-confer process as required by the Court's September 21, 2021 Scheduling Order.  (Doc. 74 ¶ 33.)

transportation of inmates to court and allowed inmates to appear telephonically at court hearings.  (*Id.* ¶ 27.)

On April 13, 2020, MCSO issued a press release about new jail procedures to mitigate and prevent the spread of COVID-19, and these measures included posting flyers in the housing areas and on inmate tablets about COVID-19 symptoms and personal hygiene; ensuring that inmates were issued bars of soap and had access to cleaning supplies like Triad cleaner to use in their housing units and cells; working with CHS to plan for housing inmates with symptoms; ensuring inmates were issued surgical masks and detention officers were issued N95 masks; and significantly reducing the jail population.  (Doc. 54 ¶ 28.)

Prior to March 15, 2020, MCSO began contacting private industry suppliers to locate and obtain additional PPE (personal protective equipment) and cleaning supplies beyond what would normally be used.  (*Id.* ¶ 29.)  At that time, there was a world-wide shortage of PPE and cleaning supplies due to the overwhelming demand.  (*Id.*)  MCSO procured a sufficient stock of PPE to meet the needs of MCSO jails, including Towers Jail and its medical units.  (*Id.* ¶ 30.)  Plaintiff disputes there were sufficient supplies, asserting there was a limited supply of face masks and that MCSO "encourage[ed] the unsanitary storage of a used, single-use only product."  (Doc. 62 ¶ 15.)

The CDC Guidance advises facilities to "make every possible effort to modify staff assignments to minimize movement across housing units and other areas of the facility" and to ensure staff are assigned to the same housing unit across shifts to prevent cross-contamination from units where infected individuals have been identified to units with no infections.  (Doc. 69 ¶ 36.)  MCSO adhered to CDC's recommendation by assigning officers to work in the same posts to prevent cross-contamination.  (Doc. 74 ¶ 36.)

Plaintiff states he observed cross-contamination firsthand, as stated in his grievance where he said he "watched employees come and go touching things in other housing units, bringing potentially contaminated items, including themselves, into [his] unit."[6]  (Doc. 69

---

[6] Plaintiff states that he gave a detailed account of the cross-contamination in a four-

¶ 41.)  Defendant disputes this statement, asserting that MCSO assigned officers to work in the same posts to prevent cross-contamination and officers were not assigned to both quarantine pods and general population pods such that they could cause cross-contamination.  (Doc. 74 ¶ 41.)  Contrary to Plaintiff's allegations Detention Officers were not assigned to both quarantine pods and general population pods, leading to cross contamination, and Detention Officers did not distribute the same items in both quarantine pods and general population pods.  (Doc. 54 ¶ 94.)  Instead, Detention Officers were assigned to work in the same posts to prevent cross-contamination of housing units, items were distributed to specific pods only, and officers were given gloves and other PPE to prevent the spread of COVID-19.  (Id. ¶¶ 95, 96.)  Although officers are required to document their movements in the jail management software called SHIELD, Defendant withheld from Plaintiff the logbooks for Plaintiff's housing units that would prove Plaintiff's allegations.  (Doc. 62 ¶ 30.)  Defendant asserts that assuming Plaintiff is referring to logbooks and security video footage, Plaintiff did not request these in discovery.  (Doc. 74 ¶ 46.)

MCSO began distributing masks even before the CDC recommended that individuals wear masks, and all inmates had been issued surgical masks without cost beginning in late March 2020.  (Doc. 54 ¶ 68.)  Inmates could receive new masks at a minimum every Saturday, and if an inmate lost or misplaced a mask or the mask became unusable for any reason, the inmate would be provided a new surgical mask upon request.  (Id. ¶ 69.)  Inmates were instructed, in English and Spanish, to wear their masks whenever possible, and to always wear them to court, medical or anytime they were outside the housing unit, and they were advised on the most effective ways to keep the mask clean.

---

page addendum to his grievance appeal, which included witness statements from other inmates who saw the same behavior, and that he made a records request for the four-page addendum, but "MCSO did not preserve the documents."  (Doc. 69 ¶¶ 42-45.)  Also, Plaintiff asked Defendant for documents that support his claim of "witnessing officer cross-contamination" such as rosters showing population count, confirmed cases by date and unit, or units on quarantine status, but Defendant has not produced any relevant documents.  (Doc. 62 ¶ 19.)

1   (*Id.* ¶ 70.)  Inmates were not required to wear their masks inside their housing units but

2   were encouraged to do so.  (*Id.* ¶ 71.)

3         Plaintiff contends that MCSO's issuance of masks was insufficient, inmates had no

4   knowledge of a mask distribution, inmates were only told to wear masks when they left the

5   housing units, and there was no direction to wear masks inside their units.  (Doc. 62 ¶ 23.)

6   Masks were in short supply, the ones distributed were "single use," with signage posted by

7   MCSO directing to "throw away disposable masks after use," and the CDC Guidance

8   ordered masks to be changed at least daily and when visibly soiled or wet.  (*Id.*)  Defendant

9   disputes that the CDC Guidance on replacing masks applied to all inmates, pointing out

10   that the CDC Guidance Plaintiff relies on relates to "Medical Isolation of Confirmed or

11   Suspected COVID-19 Cases," which states that "[a]s soon as an individual develops

12   Symptoms of COVID-19, the facility should "[e]nsure that the individual is wearing a face

13   mask at all times when outside of the medical isolation space, and whenever another

14   individual enters," and that "[m]asks should be changed at least daily, and when visibly

15   soiled or wet."  (Doc. 74 ¶ 62; Doc. 61-2 at 11.)

16         Gloves and masks were provided to inmates who worked in food preparation in

17   addition to other required protective equipment such as hair nets.  (Doc. 54 ¶ 72.)  N95

18   masks were available to all Detention Officers and staff had already been trained on how

19   to properly wear them.  (*Id.* ¶ 73.)  The Huron N5 DLV mask filter insert for the N95

20   respirator was also made available to staff.  (*Id.*)  Prior to June 29, 2020, staff were strongly

21   encouraged to wear masks in common areas in the jail, and on June 29, 2020, MCSO made

22   it a requirement and instructed Detention Officers to always wear their masks in the

23   common areas and anywhere inmate interaction could take place.  (*Id.* ¶ 74.)

24         MCSO began educating staff about COVID-19 in March 2020 and information

25   about masking was posted in the jail's access points, doorways and pod doors.  (Doc. 54

26   ¶¶ 75, 76.)  On March 18, 2020, all staff received a detailed memorandum about what was

27   known about COVID-19 at that time, including how the virus spread, steps to take to avoid

28   contracting the virus, common symptoms, and how to interact with inmates to avoid

spreading the virus.  (*Id.* ¶ 78.) On March 26, 2020, all staff received a detailed memorandum about what was known about COVID-19 at that time and the memo provided direction on responding to inmates with symptoms, disinfection protocols, transportation protocols, and PPE precaution requirements.  (*Id.* ¶ 79.)  MCSO communicated regularly with CHS to ensure MCSO was aware of any changes in CDC guidelines.  (*Id.* ¶ 80.)  Staff were instructed to stay home if they were feeling ill, had any symptoms associated with COVID-19, or if someone in their home had been diagnosed or was ill.  (*Id.* ¶ 81.)

Staff are required to respond to a series of questions attesting they are not symptomatic when logging onto a computer at the beginning of their shift.  (Doc. 54 ¶ 82.) According to Plaintiff, MCSO staff attested to not having symptoms only when needing to access the computer.  (Doc. 69 ¶ 56.)  The CDC Guidance recommends "verbal screening and temperature checks for [detainees], staff, volunteers, and visitors who enter [the facility]," but MCSO allowed staff full access to facilities without verification that they were symptom free throughout the COVID-19 pandemic.  (*Id.* ¶¶ 49, 57.)

MCSO previously conducted all shift briefings in person but changed that to an email or telephonic briefing to reduce the number of opportunities for large groups of employees to gather in close proximity.  (Doc. 54 ¶ 83.)  MCSO worked with CHS to educate the inmate population about COVID-19, and information was available in English and Spanish on inmate tablets and postings in the housing units.  (*Id.* ¶ 84.)  MCSO and CHS issued several flyers about how COVID-19 is spread, possible symptoms, who is at risk, treatment, how to avoid getting sick, and what to do if symptoms develop.  (*Id.* ¶ 85.)

Inmates were educated on the importance of proper hand washing to prevent infection, and flyers were issued and posted educating personnel and inmates on the symptoms of COVID-19, what to do if feeling sick, the mask requirement, and the importance of hand washing.  (Doc. 54 ¶ 88.)  Inmates were encouraged to practice social distancing and were educated on the importance of trying to maintain at least a six-foot distance from others.  (*Id.* ¶ 90.)  Although the CDC recognized it is not always possible to maintain six feet of distance in a correctional setting, MCSO altered its operations to

allow inmates to do so, primarily by significantly reducing the inmate population throughout the Maricopa County Jail system.  (*Id.*)

The reduction in the jail population did not affect Plaintiff's situation because he was housed in three-person cells during his stay at Towers Jail. (Doc. 62 ¶ 27.)  Defendant contends that inmates who claimed it was impossible to maintain social distance were simply not trying, whereas Plaintiff maintains there was insufficient space to stay away from other inmates, the layout of the cells did not allow adequate space, and the distance between bunks did not allow the recommended space.  (Doc. 54 ¶ 91; Doc. 62 ¶ 91.) Plaintiff did take personal responsibility and complained about the inability to socially distance in his June 1, 2020 grievance.  (Doc. 62 ¶ 28.)  According to Defendant, housing units, pods, and day room areas in all the jails are large and allow ample space for inmates to socially distance themselves.  (Doc. 54 ¶ 92.)  But Plaintiff says Towers Jail has the smallest day room of all MCSO facilities, and it has the most compact cells with three bunks and a toilet.  (Doc. 62 ¶ 29.)

### 3.      MCSO Screening Procedures and Cohort Housing Units

CHS and MCSO instituted contingency plans for confirmed or presumptive COVID-19 positive inmates to promote containment and to prevent exposure and infection into the general population.  (Doc. 54 ¶ 32.)  Inmates who presented with symptoms of COVID-19 (cough, shortness of breath, chest pain) were immediately transported to a medical segregation unit designated as Medical Observation Housing for further observation and COVID-19 testing.  (*Id.* ¶ 34.)  This promoted social distancing from the rest of the MCSO population, prevented the spread of COVID-19 among inmates and staff, and provided constant medical care, monitoring, and oversight of the inmates who had or were suspected of having COVID-19.  (*Id.*)  Inmate medical service co-pays were waived while inmates were in Medical Observation Housing.  (*Id.* ¶ 35.)

Detention officers assigned to Medical Observation Housing were required to wear a mask, gloves, and protective glasses on security walks.  (*Id.* ¶ 36.)  Detention officers were advised to avoid touching their mask until they sanitized their hands, the masks should

be changed each walk to help avoid spreading the virus, and that inmates being transported out of medical observation must wear a mask.  (*Id.* ¶ 37.)  Detention Officers transporting patients who tested positive or presented symptoms of COVID-19 were required to wear appropriate PPE, including surgical mask, gown, and gloves, and were encouraged to wear a face shield or eye protection, and inmates were required to wear a face mask.  (*Id.* ¶ 38.)

Inmates who tested positive for COVID-19 and asymptomatic inmates who were in close contact with an inmate who tested positive were placed in Medical Observation Housing where they were monitored daily by CHS staff, placed on movement restriction, and did not receive normal dayroom access with other inmates.  (*Id.* ¶ 39.)  The remaining inmates in the housing unit were placed on quarantine.  (*Id.*)

As of March 2020, CHS screened all incoming inmates upon arrival to the MCSO jail facility for symptoms of COVID-19 using a verbal screening process and completion of a Supplemental Screening Form.  (Doc. 54 ¶ 40.)  Persons at risk of having COVID-19 are classified by CHS as "Persons Under Investigation" (PUI) and have symptoms such as fever at or above 100.4, cough or shortness of breath, or recent close contact (within the prior 14 days) with a laboratory-confirmed COVID-19 individual.  (*Id.* ¶ 42.)  Other symptoms for classifying someone as PUI include fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, new loss of taste or smell, congestion or runny nose, nausea or vomiting, or diarrhea.  (*Id.* ¶ 43.)

CHS staff are required to complete the Supplemental Intake Screening Form for every incoming inmate, and the form is saved in the inmate's medical file.  (Doc. 54 ¶ 45.)  At the bottom of every form is a reminder to CHS staff to change their gloves, sanitize their workstations, and wash their hands between every encounter.  (*Id.* ¶ 46.)  CHS staff are required to comply with these protective measures and, when screening inmates, are required to wear surgical masks and gloves, and are educated on how to wear PPE equipment correctly.  (*Id.* ¶¶ 46, 47.)  Plaintiff responds that the Supplemental Screening Form is insufficient protection because the CDC says that "many individuals infected with COVID-19 do not display symptoms."  (Doc. 62 ¶ 20.)  Also, some inmates may be hesitant

to report COVID-19 symptoms to avoid being placed in isolation and so "all new entrants should have been tested appropriately." (*Id.*).

In addition to screening protocols, MCSO and CHS began cohorting new arrivals in March 2020 to keep new inmates separate from the established population. (Doc. 54 ¶ 48.) New intakes remained in cohort housing for 14 days, unless they presented with symptoms of possible COVID-19, in which case they were transported to Medical Observation Housing for testing and monitoring. (*Id.* ¶ 49.) If an inmate tested positive for COVID-19, then the housing unit where that inmate resided was placed on quarantine status and all inmates in quarantine were offered COVID-19 testing on the next business day and on or after day 14 of quarantine. (*Id.* ¶ 50.) Recovered housing was used for housing inmates together who had recovered from the virus and were no longer on movement restriction. (*Id.* ¶ 51.) Each classification of general population had a designated housing unit pod for new transfers and once the pod reached a pre-determined occupancy, it was closed for new transfers, and the pod was cohorted for a minimum of 14 days, except for release orders or exigent circumstances. (*Id.* ¶ 52.)

### 4.    MCSO Sanitation Procedures

MCSO implemented enhanced sanitation procedures in response to the COVID-19 pandemic to mitigate the spread of the virus and to protect inmates and staff. (Doc. 54 ¶ 53.) OSHA-approved Waxie 765 Lemon Quat Disinfectant Cleaner and Triad III Disinfectant were used and in ample supply at all facilities and are effective at disinfecting hard surfaces and destroying tough antibiotic-resistant viruses including MRSA, HBV, HIV, and Hepatitis B and C and were included on a list of products that met the EPA's criteria for use against COVID-19. (*Id.* ¶¶ 54, 55.) Around March 26, 2020, MCSO facilities began enhanced sanitation procedures, including at Towers Jail, and MCSO staff were directed to implement extra cleaning and sanitation of vehicles, work areas, and high-touch areas in offices, briefing rooms, and break rooms. (*Id.* ¶ 57.) Transport vehicles were also subject to enhanced sanitation procedures at the beginning and end of every shift and in between contact with inmates. (*Id.* ¶ 59.) MCSO dedicated certain vehicles to move

inmates who tested positive for COVID-19 to eliminate the possibility of infecting inmates who were not positive, and those vehicles were disinfected after each run. (*Id.* ¶ 66.)

MCSO purchased Ryobi sprayers and pump sprayers to use with Triad III cleaner to sanitize mattresses, holding cells, and living spaces. (*Id.* ¶ 60.) All housing units had their own cleaning supplies to allow for easy access by staff and inmates, medical observation cells were fully sanitized after an inmate vacated a cell prior to use by a new occupant, and common areas were fully sanitized beyond daily cleaning after inmates in the cohort had been moved out. (*Id.* ¶ 61.) Inmates had cleaning supplies in common areas of the housing unit and were encouraged to clean their housing areas; each inmate was supplied with a cleaning rag, which was replaced weekly, or more often if requested. (*Id.* ¶ 62.) "Jail trustees" were assigned to each housing unit to clean the common areas, showers, and toilets.[7] (*Id.*)

Plaintiff apparently disputes that jail trustees cleaned the toilets, stating that the toilets at Towers Jail are inside the cells. (*See* Doc. 62 ¶ 22.) Defendant also did not respond to Plaintiff's interrogatory asking what protective gear inmates were provided before being given cleaning supplies. (*Id.*) Confusingly, Plaintiff says this means "that during the 6 bed assignment changes Plaintiff was present for at the Towers Jail he was placed in cells that were not cleaned or disinfected, in the midst of a highly contagious viral epidemic, with no awareness of the last occupants COVID status," which conflicts with CDC Guidance that bunks are to be cleaned thoroughly if assigned to a new occupant. (*Id.*) Plaintiff also states that inmate laundry is exchanged once a week at each facility, which "leads one to believe that inmates more than likely were housed in cells contaminated by COVID and acquired it by cleaning or inhaling particles from the air." (*Id.*)

Hand sanitizer was available for Detention Officers, but MCSO did not provide alcohol-based hand sanitizer to inmates for security reasons because it could be used as an accelerant or to make alcohol-based liquids for consumption, which could lead to serious injury to staff or inmates. (Doc. 54 ¶ 64.) Soap and water remain the best method to kill

---

[7] Defendant does not explain what a "jail trustee" is.

1   the COVID-19 virus, and inmates in the MCSO jails had unimpeded access to soap and

2   water. (*Id.*)

3   **IV.     Fourteenth Amendment Standard**

4          A pretrial detainee has a right under the Due Process Clause of the Fourteenth

5   Amendment to be free from punishment prior to an adjudication of guilt. *Bell v. Wolfish*,

6   441 U.S. 520, 535 (1979).  "Pretrial detainees are entitled to 'adequate food, clothing,

7   shelter, sanitation, medical care, and personal safety.'" *Alvarez-Machain v. United States*,

8   107 F.3d 696, 701 (9th Cir. 1996) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir.

9   1982)).   To support a claim of unconstitutional conditions of confinement against an

10  individual defendant, a pretrial detainee must show:

11              (i) the defendant made an intentional decision with respect to
12              the conditions under which the plaintiff was confined;
                (ii) those conditions put the plaintiff at substantial risk of
13              suffering serious harm; (iii) the defendant did not take
                reasonable available measures to abate that risk, even though a
14              reasonable official in the circumstances would have
                appreciated the high degree of risk involved—making the
15              consequences of the defendant's conduct obvious; and (iv) by
16              not taking such measures, the defendant caused the plaintiff's
                injuries.
17

18  *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

19          Whether the conditions and conduct rise to the level of a constitutional violation is

20  an objective assessment that turns on the facts and circumstances of each particular case.

21  *Id.*; *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005).  However, "a de minimis

22  level of imposition" is insufficient. *Bell*, 441 U.S. at 539 n.21.  In addition, the "'mere lack

23  of due care by a state official' does not deprive an individual of life, liberty, or property

24  under the Fourteenth Amendment." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071

25  (9th Cir. 2016) (quoting *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986)).  Thus, a

26  plaintiff must "prove more than negligence but less than subjective intent—something akin

27  to reckless disregard." *Id.*

28          A governmental official may not be held responsible for the acts of his or her

subordinates under a *respondeat superior* theory of liability.  *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008).  Therefore, to state a claim against a municipality or an official of such in his official capacity, a plaintiff must go beyond the *respondeat superior* theory of liability and demonstrate that the alleged constitutional deprivation was the product of a policy or custom of the local governmental unit, because municipal liability must rest on the actions of the municipality, and not the actions of the employees of the municipality.  *See Brown*, 520 U.S. at 403; *Monell*, 436 U.S. at 690-91; *Fogel*, 531 F.3d at 834.  To make this showing, a plaintiff must demonstrate that (1) he was deprived of a constitutional right; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation.  *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

**V.  Discussion**

Plaintiff alleges in Count One that procedures at the Towers Jail put him at substantial risk of suffering harm and Defendant did not take reasonable available measures to abate that risk causing Plaintiff to contract COVID-19.  (Doc. 1 at 6-7.)  Plaintiff alleges in Count Two that MCSO did not enact different housing techniques after the pandemic made its way into the jails, despite having an empty jail, and Plaintiff reported the many ways the virus could be introduced into his housing unit, including that there was no way to remain 6 feet apart from his cellmates in his three-man cell.  (*Id*. at 4.)

Plaintiff's cause of action in this case is not for the treatment provided after he tested positive for COVID-19 but rather for the inadequacy of the preventative measures taken by MCSO to reduce the risk of contracting COVID-19.  (Doc. 69 ¶ 9.)

As noted, because Plaintiff is suing Defendant in his official capacity as the Maricopa County Sheriff, Plaintiff must show that he was deprived of constitutional conditions of confinement, causing him injury, and that this deprivation was the result of a policy or custom in effect at the MCSO jails at the relevant time.

**A.** **Conditions**

In response to Count One, Defendant argues there is sufficient evidence on the record to conclude that Defendant implemented reasonable available measures to abate the risk of COVID-19. (Doc. 53 at 12.) Defendant argues the fact that Plaintiff contracted COVID-19, despite MCSO's best efforts, does not rise to the level of a constitutional violation. (*Id*. at 13.) In response to Count Two, Defendant argues that Plaintiff has failed to produce any evidence showing he was prevented from practicing CDC Guidelines while in MCSO custody, that housing Plaintiff in a three-person cell placed Plaintiff at a substantial risk of serious harm, or that reasonable available measures to abate the risk were not taken. (*Id*. at 15-16.) Defendant argues that Plaintiff's allegations that triple bunking caused him to contract COVID-19 is nothing more than speculative. (*Id*. at 17.)

Plaintiff responds that his evidence proves MCSO inadequately managed COVID-19 prevention and containment methods at Towers Jail between March and July 2020, "despite reasonable alternatives that were available," and that MCSO's failure led to Plaintiff contracting COVID-19. (Doc. 61 at 1-2.) Plaintiff contends that the Durango Jail, which was closed in May 2020, could have been used to alleviate the three-man cells at Towers Jail and protect inmates from overcrowding. (*Id*. at 4.)

The Ninth Circuit has held that "[t]he 'reckless disregard' standard is a formidable one." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636 (9th Cir. 2021) (citing *Roman v. Wolf*, 977 F.3d 935, 947 (9th Cir. 2020)). To meet the reckless disregard standard, a plaintiff "must show that the defendant 'disregard[ed] an excessive risk to the plaintiff's health and safety by failing to take 'reasonable and available measures' that could have eliminated that risk." *Id*. (quoting *Castro*, 833 F.3d at 1070-71). In *Fraihat*, the Ninth Circuit concluded that the plaintiffs had "not made 'a clear showing' that in responding to the evolving and unprecedented COVID-19 pandemic, ICE [Immigration and Customs Enforcement] acted with 'deliberate indifference' to medical needs or in 'reckless disregard' of health risks." 16 F.4th 637 (citations omitted). It focused on ICE's March and April 2020 nationwide directives for addressing the COVID-19 pandemic

which included screening of detainees and staff for COVID-19 symptoms and exposure risk; housing, cohorting, quarantining, and testing of detainees; hygiene practices such as mask wearing and sanitation; social distancing policies for sleeping and mealtimes; health education of detainees and staff; adherence to CDC Guidance; limits on outside visits to detention facilities; and development of facility-specific mitigation plans.  *Id.* at 637-38. Because ICE's documents reflected "a mobilized effort to address what ICE acknowledged was the seriousness and pervasiveness of COVID-19," the Ninth Circuit determined that "whether one would characterize ICE's spring 2020 policy response to COVID-19 as strong, fair, needing improvement, or something else, it simply cannot be described in the way that matters here: as a reckless disregard of the very health risks it forthrightly identified and directly sought to mitigate." *Id.* at 638.

In *Roman*, which *Fraihat* cites, the Ninth Circuit held that the district court did not abuse its discretion by issuing preliminary injunctive relief in response to the plaintiffs' due process claims because the district court made detailed factual findings regarding, for example, the government's failure to impose social distancing because there were too many detainees at the facility for its size; newly arrived detainees were either mixed with the general population or housed with other new detainees who had arrived at different times; staff were not required to wear gloves and masks; there was a lack of necessary cleaning supplies and some common areas were cleaned only with a dirty towel and bucket of dirty water; there were only three showers for 118 women; detainees had to wait days for soap; and detainees were forced to sleep within six feet of each other due to the positions of the beds. *Roman*, 977 F.3d at 942-43.

There is no evidence before the Court in this case that the conditions at Towers Jail were similar to those at issue in *Roman*, where the Ninth Circuit panel agreed with the district court "that the Government likely failed to meet its constitutional duty to provide reasonably safe conditions to Plaintiffs." *Roman*, 977 F.3d at 943.  Rather, the situation at MCSO in the early months of the pandemic in 2020 were more akin to those the Ninth Circuit considered in *Fraihat*, which reflected "a mobilized effort to address . . . the

seriousness and pervasiveness of COVID-19."  For example, in the very first days of the pandemic in March 2020, MCSO suspended access to the jails by all but essential personnel and visitors, such as attorneys; consulted with CHS on addressing COVID-19; followed CDC Guidance as it evolved; reduced inmate populations; stocked additional PPE and cleaning supplies; distributed masks and cleaning supplies to prisoners and made those items available upon request; instituted enhanced sanitation and cleaning protocols; required officers to wear PPE and required inmates to wear masks when outside their housing units; posted advisories and educational flyers about COVID-19 both electronically and in print for prisoners and staff; instituted screening protocols for personnel and inmates entering the jail; cohorted inmates; and isolated prisoners with COVID-19.  As in *Fraihat*, these measures do not show a "reckless disregard of the very health risks it forthrightly identified and directly sought to mitigate."  *Id.* at 638.

While it is possible that individual MCSO officers or staff did not abide by all the directives, Plaintiff fails to present evidence that creates a triable dispute as to whether Defendant is liable for Plaintiff's injury of contracting COVID-19.  Although Plaintiff speculates his confinement in a three-person cell led to his contracting COVID-19, there is no evidence that the cell was over its capacity, as was the situation in *Roman*, and "[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  As to the weekly mask distribution, the only evidence Plaintiff cites that masks should have been provided more often was the CDC Guidance concerning prisoners in medical isolation for confirmed or suspected COVID-19 cases. Plaintiff does not allege that MCSO did not follow this CDC Guidance when he was in medical isolation.

On this record, Defendant has met his initial burden of showing that Plaintiff did not suffer a constitutional deprivation with regards to his health and safety arising from the conditions in Towers Jail, and Plaintiff has not pointed to any evidence that would create a genuine question of fact as to this showing.  Absent any evidence from which a reasonable

1    jury could conclude Plaintiff suffered a constitutional violation, Plaintiff cannot make the

2    required showing, and his official capacity claim against Defendant fails as a matter of law.

3        **B.    Policies**

4        In the alternative, Plaintiff's official capacity claim fails as a matter law because

5    Plaintiff's cannot establish the policy elements required to prevail on such a claim.  To

6    survive summary judgment, Plaintiff must point to evidence which shows that MCSO's

7    COVID-19 policy was deliberately indifferent to his constitutional right to safe and healthy

8    conditions of confinement and was the "moving force" behind his alleged constitutional

9    violation.  *Mabe*, 237 F.3d at 1110−11.  The undisputed evidence on the current record

10   does not support either showing.

11       First, the evidence does not support that Defendant's COVID-19 policies were

12   deliberately indifferent to Plaintiff's constitutional right to safe and healthy conditions of

13   confinement.  As noted, MCSO's policy followed CDC Guidance, MCSO coordinated with

14   CHS, and MCSO implemented many measures to reduce the risk of inmates and staff

15   contracting COVID-19.  These facts do not show that MCSO's policies governing the

16   response to COVID-19 were deliberately indifferent to Plaintiff's constitutional rights.

17       Second, the evidence does not support that MCSO's policies were the "moving

18   force" behind the alleged constitutional violations.  Plaintiff only speculates that a move to

19   Durango Jail or more frequent mask changes would have prevented him from contracting

20   COVID-19.  And, to the extent any individual officers or staff members did not follow

21   MCSO's directives concerning COVID-19 protocols, Plaintiff's municipal liability claim

22   must rest on the actions of MCSO, and not the actions of the employees of MCSO.  On this

23   record, there is no evidence to support that Defendant's policies were either deliberately

24   indifferent or were the "moving force" behind Plaintiff's alleged injuries.

25       Because Defendant has met his burden of showing that Plaintiff did not suffer a

26   constitutional deprivation and the relevant COVID-19 policies were not deliberately

27   indifferent to Plaintiff's health and safety or the moving force behind his alleged injuries,

28   and because Plaintiff has failed to put forth any evidence that would create a genuine issue

of material fact as to these showings, the Court will grant summary judgment to Defendant Penzone and dismiss Penzone and this action with prejudice.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendant's and Plaintiff's cross Motions for Summary Judgment (Docs. 53, 68).

(2)     Plaintiff's Motion for Summary Judgment (Doc. 68) is **denied**.

(3)     Defendants' Motion for Summary Judgment (Doc. 53) is **granted**, and the action is terminated with prejudice.  The Clerk of Court must enter judgment accordingly.

Dated this 22nd day of November, 2022.


Michael T. Liburdi
United States District Judge